**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| MALLINCKRODT PLC, *et al.*,[1] | : Case No. 20-12522 (JTD) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

------------------------------------------------------------ :x

| | |
|---|---|
| | : |
| MALLINCKRODT ENTERPRISES LLC; | : |
| ST SHARED SERVICES LLC; AND | : |
| MALLINCKRODT ARD LLC; | : Adv. Pro. No. 21-50139 (JTD) |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| KURT BRUSHABER; ALAN KILLICK; | : |
| DOUGLAS GILL; ANDREW WINECOFF; | : |
| JOSEPH SMITH; JOHN DONOVAN; RONALD | : |
| OCHOA; MICHAEL PINHAS; ALAN | : |
| McCLURE; JACK BOWER; DENELIA | : |
| DUNLAP; ANDREA NELSON; BETH | : |
| SIMPSON; and DENDREON | : |
| PHARMACEUTICALS, LLC, a wholly-owned | : |
| subsidiary of SANPOWER GROUP CO., LTD, | : |
| | : |
| Defendants. | : |

------------------------------------------------------------ x

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF,**
**DECLARATORY JUDGMENT, AND DAMAGES**

Plaintiffs Mallinckrodt Enterprises LLC, ST Shared Services LLC, and Mallinckrodt ARD

LLC (collectively "Mallinckrodt" or the "Company"), debtors in the above-captioned Chapter 11

cases (the "Chapter 11 Cases") and subsidiaries of debtor Mallinckrodt PLC, for their Amended

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

Complaint for Injunctive Relief, Declaratory Judgment, and Damages (the "Amended Complaint") against Defendants Kurt Brushaber ("Brushaber"), Alan Killick ("Killick"), Douglas Gill ("Gill"), Andrew Winecoff ("Winecoff"), Joseph Smith ("Smith"), John Donovan ("Donovan"), Ronald Ochoa ("Ochoa"), Michael Pinhas ("Pinhas"), Alan McClure ("McClure"), Jack Bower ("Bower"), Denetia Dunlap ("Dunlap"), Andrea Nelson ("Nelson"), and Beth Simpson ("Simpson") (collectively, the "Individual Defendants"), and Dendreon Pharmaceuticals, LLC, a wholly-owned subsidiary of Sanpower Group Co., Ltd. ("Dendreon"), hereby state as follows:

## INTRODUCTION

1.      In the summer of 2020, Dendreon hired two former members of Mallinckrodt's commercial leadership team, Jason O'Neill and Darlene Romine, as high-level executives.  O'Neill currently serves as Dendreon's Chief Executive Officer, while Romine is Dendreon's Senior Vice President of Sales and Market Access.

2.      After Romine and O'Neill began at Dendreon, from approximately July 2020 through January 2021, Dendreon engaged in a targeted and malicious raid of Mallinckrodt's workforce.  Rather than utilize fair and lawful recruitment efforts, Dendreon induced and encouraged employees of the Company (including several of the Individual Defendants) to solicit other Company employees to resign their employment and join Dendreon, in clear breach of the Individual Defendants' contractual and fiduciary obligations to Mallinckrodt.

3.      Moreover, Dendreon encouraged former Mallinckrodt employee Winecoff to disclose confidential trade secret information in the form of detailed sales reports from Mallinckrodt's Rheumatology Sales department in an effort to identify highly-productive Mallinckrodt employees to target in their raiding efforts.

4.      Meanwhile, nearly all of Dendreon's newly-hired former Mallinckrodt employees secretly began working for Dendreon—and directly against Mallinckrodt's interests—*while still employed by Mallinckrodt*, in clear breach of Company policy.  This prohibited "dual employment" allowed these Individual Defendants to: (1) exploit their relationships with other Mallinckrodt employees to solicit them to Dendreon; (2) continue to access (and in some cases, misappropriate) the Company's confidential information and trade secrets; and (3) defraud the Company into paying unearned salary, incentive compensation, and benefits.

5.      The ongoing harm to Mallinckrodt due to the Defendants' unlawful activities is substantial and irreparable.  Although it is not possible to quantify the monetary impact of Dendreon's unfair competition at this time, these employee departures will likely cost the Company millions of dollars in lost sales, onboarding costs to hire and train replacement employees, and harm to customer relationships and company goodwill.

6.      To protect Mallinckrodt from further irreparable harm, on April 26, 2021, the Court entered the parties' Agreed Order Granting Preliminary Injunction, which (among other things) mandates the return and remediation of Mallinckrodt confidential information in Dendreon's possession and obligates certain Individual Defendants to abide by their restrictive covenant obligations.

7.      Mallinckrodt now files this Amended Complaint seeking, among other things: (1) ongoing preliminary injunctive relief and permanent injunctive relief, to enjoin further tortious conduct and contractual breaches by the Defendants; (2) damages stemming from the Defendants' unlawful and unfair competition; (3) a declaratory judgment declaring the parties' rights and obligations under applicable contracts; and (4) the recovery and withholding of salary, incentive compensation, and/or benefits fraudulently obtained by the Individual Defendants.

### THE PARTIES

8.      Mallinckrodt Enterprises, LLC is a Delaware limited liability company with its registered address at 675 McDonnell Boulevard, St Louis, MO 63042.

9.      ST Shared Services LLC is a Delaware limited liability company.

10.     Mallinckrodt ARD LLC is a California limited liability company.

11.     Mallinckrodt Enterprises, LLC, ST Shared Services LLC, and Mallinckrodt ARD LLC are subsidiaries of Mallinckrodt PLC, which filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on October 12, 2020, currently pending as Case No. 20-12522, before the Hon. John T. Dorsey in the United States Bankruptcy Court for the District of Delaware (the "Court"). Each of these entities is a debtor and debtor in possession in the Chapter 11 Cases.

12.     Dendreon is a Delaware limited liability company, with its headquarters located at 1700 Saturn Way, Seal Beach, CA 90740.

13.     Brushaber is an individual believed to reside at 2014 Terpening Road, Harbor Springs, MI 49740.

14.     Killick is an individual believed to reside at 1503 Vestavia Circle, Melbourne, FL 32940.

15.     Gill is an individual believed to reside at 1346 S. Waccamaw Dr., Murrells Inlet, SC 29576.

16.     Winecoff is an individual believed to reside at 4460 Pecan Valley Road, Nashville, TN 37218.

17.     Smith is an individual believed to reside at 45 Glory Ridge Place, Kearneysville, WV 25430.

RLF1 25488880v.1

18.     Donovan is an individual believed to reside at 6491 Jack Linton Drive, S. Frederick, MD 21703.

19.     Ochoa is an individual believed to reside at 113 Hickory Circle, Cortland, OH 44410.

20.     Pinhas is an individual believed to reside at 1643 Atlantic Beach Dr., Atlantic Beach, FL 32233.

21.     McClure is an individual believed to reside at 10614 Vintage Creek Drive, Louisville, KY 40299.

22.     Bower is an individual believed to reside at 81 Pebble Beach Dr., Little Rock, AR 72212.

23.     Dunlap is an individual believed to reside at 3265 E. Avalon Parkway, Pike Road, AL 36064.

24.     Nelson is an individual believed to reside at 5 Via Colorso, San Clemente, CA 92672.

25.     Simpson is an individual believed to reside at 1832 Cortez Lane, Mckinney, TX 75070.

### JURISDICTION, VENUE, AND BASIS FOR RELIEF

26.     This adversary proceeding arises in and relates to Mallinckrodt's Chapter 11 Cases pending before this Court.

27.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rules 7008-1 and 9013-1(f) of the Local

5

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Mallinckrodt consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders of judgments consistent with Article III of the United States Constitution.

28.    Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409 because Mallinckrodt PLC's Chapter 11 Cases are pending before the Court.

29.    The statutory predicates for the relief requested herein are 11 U.S.C. § 105 and Bankruptcy Rules 7001(7) and 7065.

**FACTUAL BACKGROUND**

*Mallinckrodt's Business*

30.    Mallinckrodt researches, develops, and manufactures various pharmaceutical products.  Mallinckrodt and its affiliates serve customers across the United States and in countries around the world.

31.    Mallinckrodt sells a range of medical and pharmaceutical products critical to patient care, including rare disease treatments, immunotherapy products, acute care products, opioid and non-opioid pain treatment products like acetaminophen, and addiction treatment medications.

32.    In the course of its business, Mallinckrodt develops, generates, and maintains substantial confidential and proprietary information, including trade secrets.

33.    Mallinckrodt devotes significant efforts and resources to protecting its confidential information and trade secrets from unauthorized possession, use, or disclosure.  Among other things, Mallinckrodt: (1) restricts access to such information to those employees with a need to know and use such information in the performance of their job duties; (2) uses password-protected computers, devices, and systems to store and safeguard its trade secrets and confidential

information; (3) trains and instructs its employees regarding the proper use, handling, and storage of such information; and (4) requires employees to execute restrictive covenant agreements prohibiting unauthorized use or disclosure of its trade secrets and confidential information.

34. As a national and intentional pharmaceutical company, Mallinckrodt uses its trade secrets to market and sell products in interstate commerce.

***O'Neill and Romine's Former Employment with Mallinckrodt and Current Employment with Dendreon***

35. O'Neill worked for Mallinckrodt from May 2015 until February 2017 as the General Manager of the Rheumatology Unit.

36. Mallinckrodt terminated O'Neill's employment in February 2017.

37. Romine worked for Questcor Pharmaceuticals, Inc. ("Questcor") from February 21, 2012, until it was acquired by Mallinckrodt in 2014.

38. Following the acquisition, Romine continued to work for Mallinckrodt, most recently serving as its Vice President & National Sales Director – Rheumatology Sales.

39. On or about January 12, 2017, Romine resigned her employment at Mallinckrodt pursuant to a mutual separation agreement.

40. On or about June 8, 2020, Dendreon announced that O'Neill had been hired as its Chief Executive Officer.

41. On or about August 5, 2020, Dendreon announced that Romine had been hired as its Senior Vice President of Sales and Market Access, which is a role on Dendreon's Executive Committee.

42. Shortly after O'Neill and Romine began their employment with Dendreon, a steady wave of employees resigned their employment with Mallinckrodt to join Dendreon. As of the time

7

of this filing, at least thirteen (13) Mallinckrodt employees have left the Company for Dendreon

since August 2020, nearly all of them in sales roles.

***Brushaber's Employment with Mallinckrodt***

43.     Brushaber began his employment with Mallinckrodt on or about June 7, 2017.

44.     Upon his hiring and as a material term of his employment, Brushaber entered into

a Non-Competition, Non-Solicitation, and Confidentiality Agreement (the "Brushaber Covenants

Agreement") with Mallinckrodt.  A true and accurate copy of the Brushaber Covenants Agreement

is attached hereto as Exhibit 1.

45.     The Brushaber Covenants Agreement contains a number of provisions and

obligations regarding Brushaber's duty to protect Mallinckrodt's "Confidential Information" (as

defined in the Brushaber Covenants Agreement), customer and employee relationships, and

company goodwill.

46.     Brushaber expressly acknowledged he was being provided with access to

Mallinckrodt's Confidential Information, customer relationships, and goodwill, and promised to

safeguard it, in exchange for his employment.  [Ex. 1 at p. 1.]

47.     With respect to the solicitation of Mallinckrodt's employees, the Brushaber

Covenants Agreement provides, in pertinent part:

> C.     Non-Solicitation of Employees.  During the duration of your employment and for a period of twelve (12) months after your separation from employment for any reason from the Company (the "Restricted Period"), you will not solicit, interfere with, encourage or endeavor to cause any other employee or independent contractor of the Company to leave his/her employment (or independent contractor assignment) with the Company.

[*Id.* at p. 4, ¶ III(C).]

48.     Brushaber agreed that "each restriction in this Agreement is reasonable as to the

time, territory, and line of business, and is reasonably necessary to protect the Company's

legitimate business interests." [*Id.* at p. 5, ¶ III(D)(1).]

8

49.     Because of the important business interests at stake and the risk of irreparable harm to Mallinckrodt in the event of a breach, the Brushaber Covenants Agreement provides (and Brushaber agreed) that Mallinckrodt will be entitled to injunctive relief in the event of Brushaber's non-compliance with the covenants:

> 3.     You acknowledge your breach of any obligation under this Agreement will constitute immediate and irreparable damage to the Company, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order for specific performance, and other equitable relief. Further, you understand other action may be taken and remedies enforced against you. You further acknowledge your general knowledge and skill are such that enforcement of Sections I, II and III of this Agreement by injunction will not prevent you from earning a livelihood.

[*Id.* at p. 5, ¶ III(D)(3).]

50.     Mallinckrodt and Brushaber agreed that if any portion of the Brushaber Covenants Agreement was found to be unenforceable, a court of competent jurisdiction should reform the offending provisions:

> D.     The invalidity or unenforceability of any provision of this Agreement as applied to a particular occurrence or circumstance or otherwise shall not affect the validity, enforceability, and applicability of any other provision of this Agreement. Indeed, the Company and you ask any reviewing court to reform, rewrite, revise, edit or blue pencil (strike through the least amount of words, phrases, or sections) any provision in the Agreement determined to be unenforceable for any reason to make the Agreement enforceable.

[*Id.* at p. 5, ¶ IV(D).]

51.     The Brushaber Covenants Agreement also includes a choice of law provision, which states, in relevant part:

> H.     The Company has its principal place of business in Missouri. The validity, performance, construction and effect of this Agreement shall be construed, enforced and governed in accordance with the laws of the State of Missouri without regard to its conflict of laws principles. You irrevocably consent to personal jurisdiction in the state courts of Missouri and the U.S. District Court for the Eastern District of Missouri for any action arising out of this Agreement, regardless of where you reside or perform duties.

[*Id.* at p. 6, ¶ IV(H).]

52.     Brushaber worked for Mallinckrodt as a Regional Sales Manager - Rheumatology from June 7, 2017 until August 14, 2020.

9

53.     Brushaber's job responsibilities included: directing and training his sales team on reimbursement and product pull-through process; maintaining accountability for new and current patient referral pull-through process; collaborating and partnering with other Mallinckrodt departments to develop new Rheumatology sales and patient materials; leading and developing sales representatives operating across fourteen states; and hiring and training new sales representatives.

54.     On August 14, 2020, Brushaber entered into a Severance Agreement with Mallinckrodt as part of a reduction in force.  Mallinckrodt paid Brushaber more than $140,000 as severance, pursuant to the terms of the Severance Agreement.  A true and accurate copy of the Severance Agreement is attached hereto as Exhibit 2.

55.     As a material term of the Severance Agreement, Brushaber re-affirmed the restrictive covenant obligations he agreed to in the Brushaber Covenants Agreement:

> 4.     Restrictions. Any agreement signed by Employee at the time of hire or during employment regarding non-disclosure; trade secrets; confidential or proprietary information; disclosure or ownership of inventions, methods, processes or improvements; non-solicitation; or non-competition shall continue in full force and effect.

[Ex. 2 at p. 5, ¶ 4.]

56.     The Severance Agreement explicitly provides that in the event Brushaber breaches any provisions in the Severance Agreement, including his non-solicitation obligations, Mallinckrodt would not be obligated to provide Brushaber with the consideration set forth in the Severance Agreement and could seek repayment of the same:

> 14.     Breach. Employee agrees and recognizes should Employee breach any of the obligations or covenants set forth in this Agreement, the Company will have no obligation to provide Employee with the consideration set forth herein, and will have the right to seek repayment of all consideration paid up to the time of any such breach. Further, Employee acknowledges in the event of a breach of this Agreement, Releasees may seek any and all appropriate relief for any such breach, including equitable relief and/or money damages, attorney's fees and costs.

10

[*Id.* at p. 6, ¶ 14.]

57.     The Severance Agreement further provides that upon Brushaber's breach of any provisions of the Severance Agreement, including his non-solicitation obligations, Mallinckrodt would be entitled to injunctive relief:

> 15.    <u>Injunctive Relief.</u>  Employee further agrees the Company shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages, as well as to an equitable accounting of all earnings, profits and other benefits relating to or arising out of any violations of this Agreement, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.  Employee irrevocably and unconditionally (i) agrees any suit, action or other legal proceeding relating to or arising out of this Agreement, including without limitation, any action commenced by the Company for preliminary and permanent injunctive relief or other equitable relief, may be brought in the State of Missouri, (ii) consents to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) waives any objection which Employee may have to the laying of venue of any such suit, action or proceeding in any such court.  Employee also irrevocably and unconditionally consents to the service of any process, pleadings, notices or other papers by personal service or by registered or certified mail, return receipt requested, or by overnight express courier service, addressed to Employee at the home address which the Company has on file for Employee at the time such mailing occurs.

[*Id.* at pp. 6–7, ¶ 15.]

### *Killick's Employment with Mallinckrodt*

58.     Killick began working for Questcor on or about August 2, 2010.

59.     Upon his hiring and as a material term of his employment, Killick entered into a Standard Confidentiality Agreement (the "Killick Confidentiality Agreement") with Questcor.  A true and accurate copy of the Killick Confidentiality Agreement is attached hereto as <u>Exhibit 3</u>.

60.     The Killick Confidentiality Agreement contains a number of provisions and obligations regarding Killick's duty to protect Questcor's "Confidential Information," customer and employee relationships, and company goodwill.

61.     Killick agreed to submit his best efforts on behalf of Questcor and agreed not to engage in other employment detrimental to the best interests of Questcor:

> 1. I will perform for the Company such duties as may be designated by the Company from time to time. During my period of employment by the Company, I will devote my best efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

[Ex. 3 at p. 1, ¶ 1.]

62.     The Killick Confidentiality Agreement further provided that Killick would not solicit Questcor's employees:

> 7. I acknowledge that due to the confidential information that I will gain or have access to by virtue of my employment with the Company, I would be in a position to compete unfairly against the Company if, during and after my employment, I were to solicit any current employee of the Company to go to work for a competing company or business. Accordingly, I agree that while I am employed with the Company and after the termination of my employment, I will not solicit any current employee of the Company to go to work for a competing company or business.

[*Id.* at p. 2, ¶ 7.]

63.     In 2014, Questcor was acquired by Mallinckrodt in a stock transaction whereby Questcor was merged into Mallinckrodt. Pursuant to this transaction, Mallinckrodt acquired Questcor's contractual rights and obligations under the Killick Confidentiality Agreement.

64.     Killick worked for the Company from August 2, 2010 until September 25, 2020, most recently serving as the Executive Regional Sales Director – Rheumatology, Southeast United States and Puerto Rico.

65.     Killick's job responsibilities included: hiring, training, and developing new sales and reimbursement team members to represent the Southeast Region; overseeing sales activities in the Southeast Region; and expanding and developing new speakers for sales trainings at Mallinckrodt's National Sales Meetings, among other responsibilities.

***Gill's Employment with Mallinckrodt***

66.     Gill began working for Questcor in May 2012.

67.    Upon his hiring and as a material term of his employment, Gill entered into a Standard Confidentiality Agreement (the "Gill Confidentiality Agreement"), with substantially the same terms as the Killick Confidentiality Agreement, with Questcor. A true and accurate copy of the signature to the Gill Confidentiality Agreement is attached hereto as Exhibit 4.

68.    The Gill Confidentiality Agreement contains a number of provisions and obligations regarding Gill's duty to protect Questcor's "Confidential Information," customer and employee relationships, and company goodwill.

69.    Gill agreed to submit his best efforts on behalf of Questcor and agreed not to engage in other employment detrimental to the best interests of Questcor:

> 1.  I will perform for the Company such duties as may be designated by the Company from time to time.  During my period of employment by the Company, I will devote my best efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

[Ex. 4 at p. 1, ¶ 1.]

70.    The Gill Confidentiality Agreement further provided that Gill would not solicit Questcor's employees:

> 7.  I acknowledge that due to the confidential information that I will gain or have access to by virtue of my employment with the Company, I would be in a position to compete unfairly against the Company if, during and after my employment, I were to solicit any current employee of the Company to go to work for a competing company or business.  Accordingly, I agree that while I am employed with the Company and after the termination of my employment, I will not solicit any current employee of the Company to go to work for a competing company or business.

[Id. at p. 2, ¶ 7.]

71.    In 2014, Questcor was acquired by Mallinckrodt in a stock transaction whereby Questcor was merged into Mallinckrodt.  Pursuant to this transaction, Mallinckrodt acquired Questcor's contractual rights and obligations under the Gill Confidentiality Agreement.

13

72.    Gill worked for the Company from May 2012 until September 4, 2020, most recently serving as a Regional Sales Manager - Rheumatology.

73.    Gill's job responsibilities included: leading a team of seven sales specialists in the Big South region; ensuring goals on paid and shipped vials were met and referrals received; and hiring and training sales specialists for his region.

### Winecoff's Employment with Mallinckrodt

74.    Winecoff began working for Questcor in June 2010.

75.    Upon his hiring and as a material term of his employment, Winecoff entered into a Standard Confidentiality Agreement (the "Winecoff Confidentiality Agreement"), with substantially the same terms as Killick's, with Questcor. A true and accurate copy of the signature to the Winecoff Confidentiality Agreement is attached hereto as Exhibit 5.

76.    The Winecoff Confidentiality Agreement contains a number of provisions and obligations regarding Winecoff's duty to protect Questcor's "Confidential Information," customer and employee relationships, and company goodwill.

77.    Winecoff agreed to submit his best efforts on behalf of Questcor and agreed not to engage in other employment detrimental to the best interests of Questcor:

> 1.    I will perform for the Company such duties as may be designated by the Company from time to time. During my period of employment by the Company, I will devote my best efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

[Ex. 5 at p. 1, ¶ 1.]

78.    The Winecoff Confidentiality Agreement defined "Confidential Information" as follows:

> 3.    As used in this Agreement, the term "Confidential Information" means information pertaining to any aspects of the Company's business which is either information not known by actual or potential competitors of the Company or is proprietary information of the Company or its customers or suppliers, whether of a technical nature or otherwise.

14

[*Id.*, ¶ 3.]

79.     Winecoff acknowledged he would receive access to Questcor's Confidential Information as part of his employment and agreed to protect and not disclose that information, and to return it upon his separation from employment:

> 6.  I agree to hold in confidence and not directly or indirectly to use or disclose, either during or after termination of my employment with the Company, any Confidential Information I obtain or create during the period of my employment, whether or not during working hours, except to the extent authorized by the Company, until such Confidential Information becomes generally known.  I agree not to make copies of such Confidential Information except as authorized by the Company.  Upon termination of my employment, or upon an earlier request of the Company, I will return or deliver to the Company all tangible forms of such Confidential Information in my possession or control, including, but not limited to, drawings, specifications, documents, records, devices, models or any other material and copies or reproductions thereof.

[*Id.* at pp. 1–2, ¶ 6.]

80.     The Winecoff Confidentiality Agreement further provided that Winecoff would not solicit Questcor's employees:

> 7.  I acknowledge that due to the confidential information that I will gain or have access to by virtue of my employment with the Company, I would be in a position to compete unfairly against the Company if, during and after my employment, I were to solicit any current employee of the Company to go to work for a competing company or business.  Accordingly, I agree that while I am employed with the Company and after the termination of my employment, I will not solicit any current employee of the Company to go to work for a competing company or business.

[*Id.* at p. 2, ¶ 7.]

81.     In 2014, Questcor was acquired by Mallinckrodt in a stock transaction whereby Questcor was merged into Mallinckrodt.  Pursuant to this transaction, Mallinckrodt acquired Questcor's contractual rights and obligations under the Winecoff Confidentiality Agreement.

82.     Winecoff worked for the Company from June 2010 until September 28, 2020, most recently serving as a Regional Sales Manager - Rheumatology.

15

83.    Winecoff's job responsibilities included: hiring, training, and coaching a team of Immunology Sales Specialists in the rare disease market covering seven states; working with other Mallinckrodt departments to help achieve the overall goal of helping patients and driving sales; and ensuring sales goals were met for his region.

***Smith's Employment with Mallinckrodt***

84.    Smith began working for Mallinckrodt on or about November 7, 2017.

85.    Upon his hiring and as a material term of his employment, Smith entered into a Non-Competition, Non-Solicitation, and Confidentiality Agreement (the "Smith Covenants Agreement") with Mallinckrodt.  A true and accurate copy of the Smith Covenants Agreement is attached hereto as Exhibit 6.

86.    Smith worked as a Regional Trainer/Senior Sales Specialist from November 7, 2017 until January 2021.

87.    Smith's job responsibilities included training other sales representatives and selling Rheumatology products and services on behalf of Mallinckrodt.

***Donovan's Employment with Mallinckrodt***

88.    Donovan began working for Questcor on or about August 18, 2011.

89.    In 2014, Questcor was acquired by Mallinckrodt in a stock transaction whereby Questcor was merged into Mallinckrodt.

90.    Donovan worked as a Regional Sales Manager at Mallinckrodt until November 6, 2020.

91.    Donovan's job responsibilities included: hiring, training, and coaching a team of Immunology Sales Specialists in the rare disease market; working with other Mallinckrodt departments to help achieve the overall goal of helping patients and driving sales; and ensuring sales goals were met for his region.

### Ochoa's Employment with Mallinckrodt

92.     Ochoa began working for Mallinckrodt on or about February 11, 2015.

93.     Ochoa worked as a Sales Specialist at Mallinckrodt until December 11, 2020.

94.     Ochoa's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

### Pinhas's Employment with Mallinckrodt

95.     Pinhas began working for Mallinckrodt on or about January 22, 2015.

96.     Pinhas worked as an Executive Sales Specialist at Mallinckrodt until January 4, 2021.

97.     Pinhas's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

### McClure's Employment with Mallinckrodt

98.     McClure began working for Questcor on or about May 15, 2012.

99.     In 2014, Questcor was acquired by Mallinckrodt in a stock transaction whereby Questcor was merged into Mallinckrodt.

100.    McClure worked as an Executive Sales Specialist at Mallinckrodt until January 15, 2021.

101.    McClure's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

### Bower's Employment with Mallinckrodt

102.    Bower began working for Mallinckrodt on or about August 26, 2019.

103.    Bower worked as a Sales Specialist at Mallinckrodt until January 4, 2021.

104.    Bower's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

RLF1 25488880v.1

***Dunlap's Employment with Mallinckrodt***

105.     Dunlap began working for Questcor in 2012.

106.     Dunlap worked as an Executive Sales Specialist at Mallinckrodt until January 15, 2021.

107.     Dunlap's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

***Nelson's Employment with Mallinckrodt***

108.     Nelson began working for Mallinckrodt on February 10, 2015.

109.     Nelson worked as a Senior Sales Specialist at Mallinckrodt until January 18, 2021.

110.     Nelson's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

***Simpson's Employment with Mallinckrodt***

111.     Simpson began working for Mallinckrodt on or about August 2015.

112.     Simpson worked as a Senior Sales Specialist until February 3, 2021.

113.     Simpson's job responsibilities included selling Mallinckrodt products and services in the Immunology Sales Department.

***Mallinckrodt's Sales Incentive Compensation Plan***

114.     Mallinckrodt rewards and compensates its profitable and ethical sales employees with incentive compensation pursuant to its Sales Incentive Compensation Plan ("SICP").

115.     Each of the Individual Defendants were eligible to receive (and did receive) incentive compensation payments under the SICP during their employment with the Company.

116.     Mallinckrodt's written SICP Terms and Conditions explained how the Company would compensate its sales employees over the course of each year.  A true and accurate copy of

18

the 2020 SICP Terms and Conditions is attached hereto as <u>Exhibit 7</u>.  Similar terms were also adopted in 2021.

117.    The SICP Terms and Conditions impose obligations on participants to earn their incentive compensation, including the obligation to comply with Company policies and to perform his or her duties in an ethical manner.  The SICP Terms and Conditions specifically provide that the Company may withhold or recoup incentive compensation if the Company determines that a participant "engaged in conduct during the Plan Performance Period which resulted or could have resulted in the Participant's termination for Cause," as that term is defined in the SICP:

> Sales Incentive Compensation Plans (SICP) are intended to reward qualified, profitable and ethical sales representatives who are employed in good standing by the Company, who comply with all requirements to receive incentive compensation, and who perform their work in a manner consistent with the Company's standards and requirements. Incentive compensation under this Plan is not earned unless and until all other eligibility requirements of SICP and the Plan have been met and the SICP Review Period has expired with no finding by the Company of misconduct by the Participant that would have justified the Participant's termination with Cause during the Plan Performance Period. The SICP Review Period is the 180-day period that begins on the day after the conclusion of the Plan Performance Period. The Company will calculate and pay incentive compensation as soon as practicable following the end of the Plan Performance Period. However, all such payments are considered to be advances of incentive compensation and unearned unless and until the SICP Review period has ended without a negative determination concerning the Participant. If the Company determines within 180 days after the conclusion of the Plan Performance Period that the Participant engaged in conduct during the Plan Performance Period which resulted or could have resulted in the Participant's termination for Cause, any unpaid incentive compensation from the relevant Plan Performance Period will not be paid, and any advances which were paid can be recovered by the Company. It is not required that the Company terminate a Participant for Cause for the Participant to be ineligible for incentive compensation. Similarly, the payment of incentive pay does not preclude the Company from terminating a Participant for Cause.

[<u>Ex. 7</u> at p. 5.]

118.    The SICP Terms and Conditions define a termination for "Cause" as:

> *For purposes of the SICP, "Cause" means an employee's (i) substantial failure or refusal to perform duties and responsibilities of his job as required by the Company, other than due to disability, (ii) a material violation of any fiduciary duty owed to the Company or Subsidiary, (iii) conviction of a misdemeanor (other than a traffic offense) or felony, (iv) dishonesty, (v) theft, (vi) violation of a material Company rule or policy, or (vii) other egregious conduct, that has or could have a serious and detrimental impact on the Company and its employees.  The Company, in its sole and absolute discretion, shall determine whether Cause exists.

[*Id.* at p. 7.]

19

*Mallinckrodt's Global Conflict of Interest Policy*

119.     Mallinckrodt maintains a Global Conflict of Interest Policy (the "Conflicts Policy").  A true and accurate copy of the Policy is attached hereto as Exhibit 8.

120.     The general purpose of the Conflicts Policy is to inform employees of the types of situations that could give rise to conflicts of interest between the employee's interests and the Company:

**6.1 General Principles**

    **6.1.1**  Employees must avoid any relationship or activity that could affect their independent judgment in the conduct of Mallinckrodt business or that conflicts with, or could reasonably give the appearance of conflicting with, Mallinckrodt's interests. In assessing whether a situation is a Conflict of Interest, the Company will examine whether the employee's interest or activity could influence, or could give the appearance of influencing, the employee's decisions on behalf of the Company.

[Ex. 8 at p. 2, ¶ 6.1.1.]

121.     The Conflicts Policy specifically prohibits Mallinckrodt employees from working for other companies in the pharmaceutical industry while employed with the Company and requires that any employee seeking to obtain any outside employment or perform outside consulting to obtain written approval from the Company:

**6.2.2**  **Examples of Conflict of Interest:**

    6.2.2.1 **Outside Employment** – Generally, full-time employment outside of Mallinckrodt is prohibited and employees must not work for, consult with or otherwise assist a business that competes with Mallinckrodt or is a supplier to Mallinckrodt.  However, with certain exceptions, an employee may maintain limited employment outside the Company and such employment must not interfere with the employee's responsibility to the Company.  The employee's local HR representative must approve, in writing, any outside employment or consulting activity.  Any employee who works outside Mallinckrodt continues to be bound by all confidentiality and non-competition agreements he/she has with Mallinckrodt.

    If an employee's close relative is employed by, consults with, serves as an officer or director of or otherwise assists a supplier of goods or services, a competitor, customer or partner of Mallinckrodt, the employee must disclose the circumstances of the relationship to HR.

[*Id.* at p. 2, ¶ 6.2.2.1.]

122.     The Conflicts Policy requires employees to provide notice to Mallinckrodt within 30 days of the employee's knowledge of a conflict arising, while certain employees in management and other sensitive roles are required to complete an annual Conflict of Interest disclosure questionnaire:

**6.3 Disclosing Conflicts of Interest**

6.3.1   All Company employees must provide notice to the Company of an actual or potential Conflict of Interest within 30 days of employee's knowledge, relationship change and/or of the conflict arising by completing the Conflict of Interest Disclosure Form available on the Global Policies Library and the Compliance site on @work.

6.3.2   Certain employees (senior level managers and all employees regularly involved in contracting, purchasing, sale or lease of services, materials, property or products, such as employees in a procurement role) have to complete an annual Conflict of Interest disclosure questionnaire.

[*Id.* at p. 5, ¶¶ 6.3.1; 6.3.2]

***Dendreon Hires Darlene Romine and Aggressively Raids Mallinckrodt's Workforce and Induces Mallinckrodt Employees to Violate their Obligations to Mallinckrodt***

123.     On or about July 27, 2020, Dendreon hired former Mallinckrodt employee, Romine, as its Senior Vice President, Sales and Market Access.

124.     Due to her prior employment with Questcor and Mallinckrodt, Romine knew of the contractual obligations owed by employees of the Company, including their non-solicitation and non-disclosure obligations.

125.     Shortly after Romine was hired, Dendreon began aggressively poaching Mallinckrodt's employees.

126.     In June 2020, before Romine's hiring at Dendreon was even announced, Romine was in contact with Brushaber, Killick, and Gill regarding potential employment at Dendreon.

127.     Romine recruited Brushaber, Killick, and Gill to leave the Company and join Dendreon.

128.    During and after Romine's recruitment of Brushaber, Killick, and Gill, each of these former Mallinckrodt employees then solicited and encouraged one another and other Company employees to move to Dendreon as well, with Romine's knowledge and encouragement. These prohibited solicitations took place both during and after Brushaber, Killick, and Gill worked for the Company.

129.    Among other things, Brushaber, Killick, and Gill engaged in the following acts of employee solicitation, in violation of their contractual obligations and fiduciary duties they owed to the Company, including the duty of undivided loyalty:

- On July 6, 2020, Brushaber—while still employed by Mallinckrodt—emailed Gill and John Donovan ("Donovan"), another former Company employee who left Mallinckrodt to join Dendreon, seeking their assistance with finalizing Brushaber's presentation explaining why he should be hired by Dendreon.

- On July 7, 2020, Brushaber—while still employed by Mallinckrodt—forwarded an email analyzing Dendreon's performance to Donovan and Gill, in an effort to recruit Donovan and Gill to Dendreon.

- On July 28, 2020, Brushaber—while still employed by Mallinckrodt—emailed Gill enclosing a copy of Dendreon's organizational chart, which showed open roles available at the company.

- On August 7, 2020, Brushaber—while still employed by Mallinckrodt—emailed Gill a job description for "Senior Director Market Access" at Dendreon.

- On August 17, 2020, Gill—while still employed by Mallinckrodt—emailed Killick a copy of his final resume and other information he submitted to Dendreon while

seeking employment with Dendreon, to assist Killick in pursuing an opening at Dendreon.

- On August 24, 2020, Gill—while still employed by Mallinckrodt—forwarded an email to Donovan regarding "Dendreon home study and pre-training," which Gill received to prepare for his new hire orientation at Dendreon and forwarded to Donovan to assist his transition to Dendreon.

- On August 24, 2020, Brushaber forwarded an email to Gill explaining Dendreon's travel and expense policy.

- On August 25, 2020, Killick—while still employed by Mallinckrodt—emailed Brushaber's resume to Donovan, in an effort to assist Donovan on how to style and prepare his resume for consideration of employment with Dendreon.

- On August 29, 2020, Brushaber, Killick, and Winecoff—while still employed by Mallinckrodt—conducted a Zoom meeting, presumably to discuss their pending/upcoming move(s) to Dendreon and other potential employee targets to solicit to join them.

130.    Since Brushaber, Killick, and Gill left the Company to join Dendreon, at least 10 other employees have left the Company to join Dendreon, including several who worked directly with and/or under Brushaber, Killick, Gill, and Winecoff.

***Mallinckrodt Employees Simultaneously Worked for Dendreon and Mallinckrodt, Violating the Company's Conflicts Policy***

131.    With the exception of Brushaber, all of the Individual Defendants' period of employment at Mallinckrodt overlapped with their employment at Dendreon—in many cases, by several weeks, and some by nearly 2 months.

132.    In other words, the Individual Defendants secretly worked for Dendreon while they were still employed by Mallinckrodt, in clear breach of the Company's Conflicts Policy.  While employed by Dendreon, these Individual Defendants received pay and benefits from Mallinckrodt, accumulated paid time off (which was later paid out upon their departures), and retained access to significant Mallinckrodt Confidential Information.

133.    For example, email records show that certain Individual Defendants (including Killick, Gill, Winecoff, Smith, Donovan, and Ochoa), maintained active Dendreon email addresses while they were still employed by Mallinckrodt, indicating their employment at Dendreon overlapped with their employment at Mallinckrodt.  A review of these email accounts reveals that these Individual Defendants were performing work on behalf of Dendreon, and working for Dendreon's benefit and against Mallinckrodt's interests, prior to their departure from the Company.

134.    On August 12, 2020, Gill and Killick—while still employed by Mallinckrodt—received video training from Dendreon in order to sell a Dendreon product.

135.    On August 27, 2020, Romine emailed preparation materials to Killick and Gill, which were designed to prepare Killick and Gill for their employment at Dendreon and New Hire Orientation.

136.    On August 31, 2020, Gill—while still employed by Mallinckrodt—attended a New Hire Orientation at Dendreon.

137.    A Dendreon "Rep List" circulated by Romine lists August 31, 2020 as Gill's start date with Dendreon, which is before the date Gill left Mallinckrodt.

138.    Romine emailed both Killick and Winecoff on September 6, 2020, enclosing what appeared to be territory maps or maps containing information on various sales regions across the

24

country.  Romine represented to Killick and Wincoff that the "data is yours," indicating that Killick and Winecoff assisted in the creation of these maps while still employed by Mallinckrodt.

139.    On September 11, 2020, email evidence shows Killick received a "welcome email" from Dendreon, while he was still employed by Mallinckrodt.

140.    Also on September 11, 2020, Winecoff received a similar "welcome email" from Dendreon, while he was still employed by Mallinckrodt.

141.    Dendreon appears to have announced Killick's hiring by the company in mid-September 2020, before he left Mallinckrodt.

142.    On or about September 21, 2020, Killick and Winecoff—while still employed by Mallinckrodt—attended a Dendreon sales team meeting in Seattle, WA.

143.    On December 19, 2020, Smith—while still employed by Mallinckrodt—forwarded meal expenses from his Mallinckrodt email address to his own Dendreon email address, presumably to obtain reimbursement from Dendreon for expenses incurred by Smith on Dendreon's behalf.

144.    Upon information and belief, Gill began working for Dendreon on August 31, 2020.

145.    Gill remained employed by Mallinckrodt until September 4, 2020.

146.    Upon information and belief, Killick began working for Dendreon on September 14, 2020.

147.    Killick remained employed by Mallinckrodt until September 25, 2020.

148.    Upon information and belief, Winecoff began working for Dendreon on September 14, 2020.

149.    Winecoff remained employed by Mallinckrodt until September 28, 2020.

25

150.   Upon information and belief, Smith began working for Dendreon on November 30, 2020.

151.   Smith remained employed by Mallinckrodt until early January 2021.

152.   In early January 2021, after receiving Smith's notice of resignation, Mallinckrodt's Human Resources personnel reached out to Dendreon's Human Resources personnel to discuss his departure.   During this call, Dendreon confirmed that Smith began his employment with Dendreon on November 30, 2020, more than a month before he tendered his notice of resignation to Mallinckrodt.

153.   In light of this information, Mallinckrodt retroactively terminated Smith's employment with the Company "for cause," effective November 29, 2020.

154.   Upon information and belief, Donovan began working for Dendreon on October 26, 2020.

155.   Donovan remained employed by Mallinckrodt until November 6, 2020.

156.   Upon information and belief, Ochoa began working for Dendreon on December 7, 2020.

157.   Ochoa remained employed by Mallinckrodt until December 11, 2020.

158.   Upon information and belief, Pinhas began working for Dendreon on November 30, 2020.

159.   Pinhas remained employed by Mallinckrodt until January 4, 2021.

160.   Upon information and belief, McClure began working for Dendreon on November 30, 2020.

161.   McClure remained employed by Mallinckrodt until January 15, 2021.

162.    Upon information and belief, Bower began working for Dendreon on December 21, 2020.

163.    Bower remained employed by Mallinckrodt until early January 4, 2021. Bower initially attempted to give two weeks' notice of his resignation on January 4, 2021, then on the same day opted to resign effective immediately.

164.    Upon information and belief, Dunlap began working for Dendreon on December 7, 2020.

165.    Dunlap remained employed by Mallinckrodt until January 15, 2021.

166.    Upon information and belief, Nelson began working for Dendreon on December 28, 2020.

167.    Nelson remained employed by Mallinckrodt until January 18, 2021.

168.    Upon information and belief, Simpson began working for Dendreon on January 18, 2021.

169.    Simpson remained employed by Mallinckrodt until February 3, 2021.

170.    Mallinckrodt was not aware that the Individual Defendants were working for Dendreon, and against Mallinckrodt's interests, while employed with the Company.  If known at the time, this fact would have been grounds for the Individual Defendants' immediate termination from the Company.

***Winecoff and Dunlap Misappropriate Mallinckrodt Confidential Information and Trade Secrets***

171.    On September 24, 2020—*i.e.*, after he started working for Dendreon, but before his termination date with the Company—Winecoff emailed several highly confidential documents to Romine and O'Neill at Dendreon.

27

172.    These documents included voluminous sales reports tracking Mallinckrodt sales across the rheumatology department. Many of the individual sales representatives identified in the report are now identified as Individual Defendants to this lawsuit, implying Winecoff, Romine, O'Neill, and Dendreon utilized Mallinckrodt's confidential information misappropriated by Winecoff to identify additional Mallinckrodt employees to poach.

173.    On September 25, 2020, Winecoff emailed several highly confidential documents from his Mallinckrodt email address to his personal email address.

174.    These documents included (1) a collection of detailed reports containing referral source names and sales data; and (2) a 7,500-page sales report from April 2020 containing referral source names and sales data.

175.    Throughout December 2020 and into January 2021—*i.e.*, after she started working for Dendreon, but before her termination date with the Company—Dunlap emailed several highly confidential documents from her Mallinckrodt email address to her personal email address.

176.    These documents included detailed sales reports, which included referral source names and sales data.

177.    The documents Winecoff and Dunlap forwarded to their personal email addresses are detailed compilations of data which the Company has expended considerable resources to compile.  These documents have independent economic value by virtue of being not generally known to the public, and the Company has undertaken reasonable efforts to maintain the secrecy of these documents.

28

## CAUSES OF ACTION

### Count I
### Breach of Contract – Covenants Agreement
### (Brushaber)

178.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

179.    Mallinckrodt has a valid and enforceable contractual relationship with Brushaber pursuant to the Brushaber Covenants Agreement.

180.    Under the terms of the Brushaber Covenants Agreement, Brushaber is contractually prohibited, for a period of one year, from soliciting Mallinckrodt employees to leave their employment with the Company.

181.    Brushaber solicited Mallinckrodt employees to leave their employment and join Dendreon.

182.    Brushaber's actions constitute a breach of the Brushaber Covenants Agreement.

183.    Mallinckrodt did not first materially breach the Brushaber Covenants Agreement and has not excused Brushaber's non-performance.

184.    As a direct and proximate result of Brushaber's breaches, Mallinckrodt has been damaged and is entitled to recover all available damages.

185.    As a direct and proximate result of Brushaber's breaches, Mallinckrodt has suffered and continues to suffer irreparable harm, entitling it to injunctive relief pursuant to the terms of the Brushaber Covenants Agreement.

### Count II
### Breach of Contract – Severance Agreement
### (Brushaber)

186.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

29

187.    Mallinckrodt has a valid and enforceable contractual relationship with Brushaber pursuant to the Severance Agreement.

188.    Under the terms of the Severance Agreement, Brushaber was paid in excess of $140,000 in severance pay.  In exchange for these sums, Brushaber promised to abide by the terms of his Covenants Agreement, among other promises.

189.    The Severance Agreement provides that Brushaber shall be obligated to repay the severance payments to Mallinckrodt in the event of his breach of the terms of the Severance Agreement.

190.    Brushaber solicited Mallinckrodt employees to leave their employment and join Dendreon.

191.    Brushaber's actions constitute a breach of the Brushaber Covenants Agreement, and therefore, a breach of the Severance Agreement.

192.    Mallinckrodt did not first materially breach the Severance Agreement and has not excused Brushaber's non-performance.

193.    As a direct and proximate result of Brushaber's breaches, Mallinckrodt has been damaged and is entitled to recover all available damages, including the recoupment of all monies paid under the Severance Agreement.

**Count III**
**Breach of Contract – Confidentiality Agreement**
**(Killick)**

194.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

195.    Mallinckrodt has a valid and enforceable contractual relationship with Killick pursuant to the Killick Confidentiality Agreement.

RLF1 25488880v.1

196.    Under the terms of the Killick Confidentiality Agreement, Killick is contractually prohibited from soliciting Mallinckrodt employees to leave their employment with the Company.

197.    Killick solicited Mallinckrodt employees to leave their employment and join Dendreon.

198.    Killick's actions constitute a breach of the Killick Confidentiality Agreement.

199.    Mallinckrodt did not first materially breach the Killick Confidentiality Agreement and has not excused Killick's non-performance.

200.    As a direct and proximate result of Killick's breaches, Mallinckrodt has been damaged and is entitled to recover all available damages.

201.    As a direct and proximate result of Killick's breaches, Mallinckrodt has suffered and continues to suffer irreparable harm, entitling it to injunctive relief.

**Count IV**
**Breach of Contract – Confidentiality Agreement**
**(Gill)**

202.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

203.    Mallinckrodt has a valid and enforceable contractual relationship with Gill pursuant to the Gill Confidentiality Agreement.

204.    Under the terms of the Gill Confidentiality Agreement, Gill is contractually prohibited from soliciting Mallinckrodt employees to leave their employment with the Company.

205.    Gill solicited Mallinckrodt employees to leave their employment and join Dendreon.

206.    Gill's actions constitute a breach of the Gill Confidentiality Agreement.

207.    Mallinckrodt did not first materially breach the Gill Confidentiality Agreement and has not excused Gill's non-performance.

31

208.    As a direct and proximate result of Gill's breaches, Mallinckrodt has been damaged and is entitled to recover all available damages.

209.    As a direct and proximate result of Gill's breaches, Mallinckrodt has suffered and continues to suffer irreparable harm, entitling it to injunctive relief.

**Count V**
**Breach of Contract – Confidentiality Agreement**
**(Winecoff)**

210.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

211.    Mallinckrodt has a valid and enforceable contractual relationship with Winecoff pursuant to the Winecoff Confidentiality Agreement.

212.    Under the terms of the Winecoff Confidentiality Agreement, Winecoff is contractually obligated to: (1) refrain from the unauthorized use or disclosure of Company "Confidential Information" (as defined in the Winecoff Confidentiality Agreement); (2) not make unauthorized copies of Confidential Information; and (3) return and deliver all Confidential Information to the Company upon the conclusion of employment.

213.    Shortly prior to his departure from the Company, Winecoff forwarded substantial amounts of Confidential Information to his personal email address without authorization.

214.    Winecoff also emailed substantial amounts of Confidential Information to Romine and O'Neill at Dendreon.

215.    Winecoff's actions constitute a breach of the Winecoff Confidentiality Agreement.

216.    Mallinckrodt did not first materially breach the Winecoff Confidentiality Agreement and has not excused Winecoff's non-performance.

217.    As a direct and proximate result of Winecoff's breaches, Mallinckrodt has been damaged and is entitled to recover all available damages.

32

218.    As a direct and proximate result of Winecoff's breaches, Mallinckrodt has suffered and continues to suffer irreparable harm, entitling it to injunctive relief.

**Count VI**
**Trade Secret Misappropriation – DTSA**
**(Winecoff, Dunlap, and Dendreon)**

219.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

220.    Mallinckrodt's confidential and proprietary information described herein, including its detailed compilations of confidential sales data and referral source information, derive independent economic value from not being generally known to the public or to others who can obtain economic value from its disclosure or use.

221.    Mallinckrodt has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

222.    Accordingly, such information constitutes "trade secrets" pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. ("DTSA").

223.    The trade secrets at issue in this case relate to products or services used in, or intended for use in, interstate commerce.

224.    Winecoff and Dunlap gained access to Mallinckrodt's trade secret information in the course of their employment relationship with Mallinckrodt and were under an obligation to maintain the secrecy of Mallinckrodt's trade secret information obtained during their employment with the Company and thereafter.

225.    In violation of their obligations to maintain the secrecy of Mallinckrodt's trade secret information, Winecoff and Dunlap acquired, used, and/or disclosed Mallinckrodt's trade secret information without the Company's authorization.

33

226.    In particular, Winecoff and Dunlap forwarded detailed compilations of confidential Mallinckrodt sales data to their personal email accounts and other Dendreon employees (Romine and O'Neill), without authorization and in violation of Company policy.

227.    Dendreon gained access to Mallinckrodt's trade secret information by virtue of hiring Winecoff and advising Winecoff to provide this information to Dendreon. Dendreon appears to have accessed and utilized Mallinckrodt's trade secret information to identify other Mallinckrodt employees to poach.

228.    Winecoff, Dunlap, and Dendreon misappropriated Mallinckrodt's trade secret information maliciously and in willful and conscious disregard of the Company's rights.

229.    As a direct and proximate result of Winecoff's, Dunlap's, and Dendreon's violations of the DTSA, Mallinckrodt has been damaged and is entitled to recover all available damages.

230.    As a direct and proximate result of Winecoff's, Dunlap's, and Dendreon's violations of the DTSA, Mallinckrodt has suffered and continues to suffer irreparable harm, entitling it to injunctive relief pursuant to the DTSA.

## Count VII
### Breaches of Fiduciary Duties/Duty of Loyalty
### (Individual Defendants)

231.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

232.    As employees of Mallinckrodt, the Individual Defendants owed the Company a duty of undivided loyalty.  This duty required the Individual Defendants to work for the benefit of Mallinckrodt and to refrain from taking actions detrimental or injurious to the interests of Mallinckrodt during their employment.

34

233.     Brushaber, Killick, and Gill breached said duties by, among other things, recruiting and soliciting Mallinckrodt employees to resign from their employment and work for another pharmaceutical company, Dendreon, while still employed by the Company and, upon information and belief, encouraging other departing employees of the Company to do the same.

234.     The Individual Defendants further breached said duties by, among other things, remaining employed by Mallinckrodt while simultaneously working for another pharmaceutical company, Dendreon, in order to obtain unearned compensation from the Company and, upon information and belief, encouraging other departing employees of the Company to do the same.

235.     As a direct and proximate result of the Individual Defendants' conduct, Mallinckrodt has been damaged and is entitled to recover all available damages.

**Count VIII**
**Breach of Contract – SICP**
**(Killick, Gill, Winecoff, Smith, Donovan, Ochoa,**
**Pinhas, McClure, Bower, Dunlap, Nelson, and Simpson)**

236.     Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

237.     Pursuant to Mallinckrodt's SICP, Killick, Gill, Winecoff, Smith, Donovan, Ochoa, Pinhas, McClure, Bower, Dunlap, Nelson, and Simpson received incentive compensation, or were scheduled to receive incentive compensation, for the fourth quarter of 2020 ("Q4 2020") and/or the first quarter of 2021 ("Q1 2021").

238.     Mallinckrodt's SICP Terms and Conditions provide that employees are only entitled to receive and/or keep their incentive compensation under the SICP if Mallinckrodt determines the otherwise-eligible employees did not commit offenses that would warrant termination "for cause" during the Plan Performance Period, as determined during the 180-day Review Period after the Plan Performance period concludes.

35

239.     Under the SICP Terms and Conditions, any payments made prior to the conclusion of the Review Period are considered advances which the Company may recoup in the event of a determination that an employee engaged in misconduct during the Plan Performance Period which warranted, or would have warranted, termination for cause.

240.     The actions committed by Killick, Gill, Winecoff, Smith, Donovan, Ochoa, Pinhas, McClure, Bower, Dunlap, Nelson, and Simpson in fraudulently working simultaneously for Mallinckrodt and Dendreon constitute breaches of Mallinckrodt's Global Conflicts of Interest Policy.  Had Mallinckrodt known about this misconduct, it would have been grounds for these Individual Defendants' immediate termination for cause.

241.     The actions committed by Killick and Gill in soliciting employees of the Company to leave their employment and join Dendreon constitute breaches of their restrictive covenants and duty of loyalty obligations to Mallinckrodt, warranting termination for cause.

242.     The actions committed by Winecoff and Dunlap in misappropriating the Company's confidential information and trade secrets warrant termination for cause.

243.     Pinhas, McClure, Bower, Nelson, and Simpson were all paid advances on incentive compensation pursuant to the SICP for Q4 2020 and/or Q1 2021.

244.     Mallinckrodt withheld Q4 2020 and/or Q1 2021 incentive compensation from Killick, Gill, Winecoff, Smith, Donovan, Ochoa, Dunlap, and Simpson, pursuant to the SICP Terms and Conditions, upon the discovery of the above-described misconduct.

245.     Killick, Gill, Winecoff, Smith, Donovan, Ochoa, Pinhas, McClure, Bower, Dunlap, Nelson, and Simpson are not entitled to retain and/or receive said incentive compensation due to their failure to comply with the requirements set forth in the SICP Terms and Conditions.

246.    As a direct and proximate result of the misconduct described above, Mallinckrodt has been damaged and is entitled to recover and/or withhold all Q4 2020 and/or Q1 2021 incentive compensation from Killick, Gill, Winecoff, Smith, Donovan, Ochoa, Pinhas, McClure, Bower, Dunlap, Nelson, and Simpson, to which they are not entitled.

**Count IX**
**Unjust Enrichment**
**(Individual Defendants)**

247.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

248.    Through the actions alleged herein, the Individual Defendants have been unjustly enriched and benefited by, among other things, the receipt and retention of unearned salary and incentive compensation, severance pay, and Mallinckrodt's confidential information.

249.    These benefits were obtained improperly, unlawfully, and under circumstances under which it would be unjust for the Individual Defendants to retain said benefits.

250.    As a matter of equity, the Individual Defendants should be required to disgorge any and all benefits they have unjustly received, including any unearned salary, incentive compensation, revenues, profits, commissions, and income resulting from the improper and unlawful conduct alleged herein and to reimburse Mallinckrodt in an amount equal to said unjust enrichment.

**Count X**
**Tortious Interference with Contractual Relationships**
**(Dendreon)**

251.    Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

252.   Mallinckrodt has valuable and enforceable contractual commitments from the Individual Defendants, including restrictive covenants and confidentiality obligations contained in the agreements described herein.

253.   Dendreon has knowledge of these contractual obligations.

254.   Dendreon has intentionally induced the breach of Mallinckrodt's contractual relationships with the Individual Defendants.

255.   Dendreon has aided and abetted the Individual Defendants in the breaches of their agreements.

256.   Dendreon has acted without justification for inducing said breaches.

257.   Dendreon's tortious conduct was willful, malicious, and done in conscious disregard of Mallinckrodt's rights.

258.   As a direct and proximate result of Dendreon's conduct, Mallinckrodt has been damaged and is entitled to recover all available damages, including compensatory and punitive damages.

259.   Mallinckrodt is entitled to preliminary and permanent injunctive relief to enjoin Dendreon's ongoing breaches.

**Count XI – Aiding and Abetting Breaches of Fiduciary Duty/Duty of Loyalty**
**(Dendreon)**

260.   Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

261.   As employees of Mallinckrodt, the Individual Defendants owed Mallinckrodt a duty of undivided loyalty, which required the Individual Defendants to refrain from working against the interests of Mallinckrodt while employed by the Company.

38

262.     Dendreon knew the Individual Defendants owed these duties to Mallinckrodt while they were employed by the Company.

263.     Dendreon instructed, encouraged, and facilitated the Individual Defendants' breaches of their duty of loyalty to Mallinckrodt.

264.     As a direct and proximate result of Dendreon's actions, Mallinckrodt has been damaged and is entitled to recover all available damages.

265.     Mallinckrodt is entitled to preliminary and permanent injunctive relief to enjoin Dendreon's ongoing breaches.

## Count XII
### Declaratory Judgment
### (Individual Defendants)

266.     Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

267.     An actual and justiciable controversy exists between Mallinckrodt, on the one hand, and the Individual Defendants, on the other hand, concerning their rights and obligations under their agreements, including the Covenants Agreements, Confidentiality Agreements, Severance Agreement, and SICP.

268.     Pursuant to 28 U.S.C. § 2201, Mallinckrodt is entitled to a declaration of its rights and obligations under said agreements, including that: (1) the Individual Defendants owe ongoing restrictive covenant obligations to the Company under their applicable agreements; (2) the Individual Defendants are not owed further incentive compensation from the Company under the SICP; and (3) Brushaber is obligated to re-pay the severance payments he received under his Severance Agreement.

RLF1 25488880v.1

269.     Pursuant to 28 U.S.C. § 2202, Mallinckrodt is entitled to any "further necessary or proper relief" as may be warranted based on the Court's declaration of Mallinckrodt's rights and obligations.

## Count XIII
## Injunctive Relief
## (All Defendants)

270.     Mallinckrodt incorporates by reference the foregoing allegations as though fully set forth herein.

271.     As a direct and proximate result of the Defendants' tortious conduct and contractual breaches alleged herein, Mallinckrodt has suffered and will continue to suffer actual and threatened irreparable harm, including to its market share, goodwill, standing in the industry, and in its relationships with its customers and employees, as well as the potential disclosure of its confidential information and trade secrets, which cannot be quantified in monetary damages.

272.     Mallinckrodt is entitled to ongoing preliminary injunctive relief, and permanent injunctive relief, to prevent further breaches by the Defendants.

273.     Mallinckrodt will suffer immediate and irreparable harm if relief is denied which outweighs any harm to the Defendants.

274.     The public interest will not be harmed if an injunction is granted.

### PRAYER FOR RELIEF

WHEREFORE, Mallinckrodt respectfully requests the Court enter judgment in its favor and award it the following relief:

A.     Entry of preliminary and permanent injunctive relief restraining and prohibiting the Individual Defendants from directly or indirectly soliciting any current Company employee for the duration of their contractual obligations to Mallinckrodt;

40

B.      Entry of preliminary and permanent injunctive relief restraining and prohibiting Dendreon from aiding, assisting, inducing, or encouraging any current or former employee of Mallinckrodt in breaching their contractual or fiduciary obligations to the Company;

C.      Entry of preliminary and permanent injunctive relief requiring the Defendants to:

      i.      Account for all property and confidential information belonging to or originating from Mallinckrodt in their possession, custody, or control;

      ii.      Return all property and confidential information belonging to or originating from Mallinckrodt in their possession, custody or control;

      iii.      Permanently destroy all hard copies of the same, and to delete any electronic copies of the same from all email accounts, computers, cell phones, storage devices, cloud storage accounts, networks, and any other electronic media or storage device or account available to or accessible by them; and

      iv.      Provide independent verification of compliance with said injunction.

D.      An equitable extension of the terms of the restrictive covenants to ensure Mallinckrodt is made whole and receives the benefit of its bargain in the applicable covenants;

E.      All available monetary damages, including but not limited to lost profits, compensatory damages, liquidated damages, punitive damages, costs, and attorneys' fees, as well as any pre- and post-judgment interest as allowed by law;

F.      Disgorgement of any benefits, profits, incentive compensation paid pursuant to Mallinckrodt's SICP, or other salary, compensation, or unjust enrichment improperly obtained by the Individual Defendants;

G.      Declaratory judgment declaring the parties' rights and obligations under the terms of their applicable agreements, including but not limited to a declaration that: (1) the Individual Defendants are obligated to abide by the written terms and conditions of their restrictive covenants; (2) Mallinckrodt may withhold and/or recoup certain incentive payments pursuant to the SICP; and (3) Brushaber is obligated to repay monies pursuant to the Severance Agreement;

41

H.    "Further necessary or proper relief" based on the Court's declarations of the parties'

rights and obligations, pursuant to 28 U.S.C. § 2202; and

I.    All other relief the Court deems appropriate.

[signature page follows]

RLF1 25488880v.1

Dated: June 15, 2021
       Wilmington, Delaware

*/s/ Robert J. Stearn, Jr.*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Robert C. Maddox (No. 5356)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    stearn@rlf.com
    merchant@rlf.com
    steele@rlf.com
    maddox@rlf.com
    schlauch@rlf.com

**OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.**

Daniel O'Meara (admitted *pro hac vice*)
1735 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone:    (215) 995-2883
Facsimile:    (215) 995-2801
Email:    dan.omeara@ogletree.com

Justin A. Allen (admitted *pro hac vice*)
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Telephone:    (317) 916-1300
Facsimile:    (317) 916-9076
Email:    justin.allen@ogletree.com

**LATHAM & WATKINS LLP**
George A. Davis (admitted *pro hac vice*)
Christopher Harris (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    christopher.harris@lw.com
    george.klidonas@lw.com
    andrew.sorkin@lw.com
    anu.yerramalli@lw.com
    hugh.murtagh@lw.com

Jeffrey E. Bjork (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:    jeff.bjork@lw.com

Elizabeth Marks (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Telephone:    (617) 948-6000
Facsimile:    (617) 948-6001
Email:    betsy.marks@lw.com

Jason B. Gott (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:    jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

43